IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :
          v.                      :     CRIMINAL NO. 09-378-02
                                  :                  09-378-03
DIONI SANTIAGO-RODRIGUEZ and      :
ORLANDO SUASTEGUI                 :

**Jones II, J.**                                    **May 28, 2010**

## MEMORANDUM

Presently before the Court are the post-trial motions of Defendant Dioni Santiago-Rodriguez (Dkt. No. 112) and Defendant Orlando Suastegui (Dkt. No. 115), presumably pursuant to Rules 29 and/or 33 of the Federal Rules of Criminal Procedure,[1] as well as the Government's Opposition thereto (Ex. A to Dkt. No. 116) ("Govt. Opp."). For the following reasons, Defendants' Motions shall be denied.

## I.    PROCEDURAL HISTORY

Defendants Santiago-Rodriguez and Suastegui were arrested by the Philadelphia Police on January 28, 2009, after being surveilled with close to a kilogram of cocaine and a 9-millimeter handgun in a sports utility vehicle owned by a third defendant, Eduardo Chopin-Meza. On or about March 30, 2009, a complaint and warrant were filed against all three defendants in federal court. The defendants made their initial appearances on or about May 18, 2009.

On June 2, 2009, a federal grand jury returned a six-count indictment charging all three defendants with the following: (i) conspiracy to distribute at least 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846; (ii) possession with intent to distribute at

---

[1] Neither Santiago-Rodriguez nor Suastegui cite any legal authority in support of their Motions.

least 500 grams of cocaine, in violation of 21 U.S.C. §§841(a)(1), (b)(1)(B); (iii) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (iv) possession of a firearm by an illegal alien, in violation of 18 U.S.C. §922(g)(5)(A). In addition, the grand jury charged Chopin-Meza with (v) re-entry into the United States without permission, as an aggravated felon who had previously been deported, in violation of 8 U.S.C. §§ 1326(a), (b)(2); and (vi) making false statements in an application for a United States passport, in violation of 18 U.S.C. § 1542.

On or about September 27, 2009, Santiago-Rodriguez filed a number of pretrial motions, which this Court denied in Orders dated October 29, 2009 and November 3, 2009. On or about January 25, 2010, Santiago-Rodriguez refiled these motions; once again, they were denied, this time by Order dated February 8, 2010.

Suastegui filed four pretrial motions, which were identical to pretrial motions previously filed by Santiago-Rodriguez. This Court denied these motions in its February 8, 2010 Order. Neither Santiago-Rodriguez nor Suastegui sought severance in their initial pretrial motion filings.

On or about February 17, 2010, Santiago-Rodriguez entered guilty pleas to the drug-related charges (Counts I and II), leaving for trial the gun-related charges (Counts III and IV). Likewise, Chopin-Meza entered guilty pleas to Counts I, II, V and VI, leaving for trial the gun-related charges (Counts III and IV). Suastegui contested all four charges brought against him.

Subsequent to Santiago-Rodriguez and Chopin-Meza's guilty pleas, on February 17, 2010 Suastegui moved to sever his trial from that of his co-defendants, claiming that their pleas would necessarily implicate him in the drug conspiracy. This Court denied the severance motion.

Trial began on February 18, 2010 and ended on March 2, 2010, with the jury finding

Suastegui guilty of the drug-related charges (Counts I and II) and finding all three defendants guilty of possession of a firearm in furtherance of a drug trafficking crime (Count III). Each of the defendants was found not guilty of being an illegal alien in possession of a firearm (Count IV).

The Government's confidential informant ("CI") testified at trial. During the course of the CI's cross-examination by Suastegui, the Government disclosed to the Court and counsel at sidebar that the CI had earlier engaged in unfruitful conversations with Santiago-Rodriguez about the purchase of a firearm.[2] Counsel for Suastegui and Chopin-Meza argued that such information was relevant and admissible to establish that the gun found in Chopin-Meza's car belonged to Santiago-Rodriguez. Santiago-Rodriguez, however, argued that the evidence was unduly prejudicial. Suastegui and Chopin-Meza therefore moved for a severance. The Government argued that the evidence of another gun transaction was categorically inadmissible under Federal Rule of Evidence 404(b) as a prior bad act relevant only to propensity. The Court ruled that it would exclude such evidence for the purposes of the trial, and would revisit the issue of its prejudicial effect in the event of guilty verdicts.

Based on the Court's ruling, the Government instructed the CI to refrain from testifying about the earlier firearm transaction. Nonetheless, under cross-examination by Suastegui regarding the informant's relationship with Santiago-Rodriguez, the CI did refer to an unconsummated gun transaction. Counsel for Santiago-Rodriguez declined the Court's offer of a

---

[2]The Government contends that during discovery, it made counsel for Santiago-Rodriguez aware of the existence of such conversations, although not of the fact that the conversations had involved the same CI with whom Santiago-Rodriguez had brokered the cocaine transaction for which the three defendants were on trial.

curative instruction, concluding that such an instruction would merely draw attention to the CI's remark. That isolated statement was never repeated, and was not commented upon thereafter by any counsel.

## II. STATEMENT OF FACTS[3]

On January 28, 2009, at approximately 1:30 p.m., Drug Enforcement Agency ("DEA") Special Agent Mark Koss was contacted by the CI, who had previously supplied reliable information leading to an arrest. The CI stated that he had been approached by an individual known to him as "Poppy" (later identified as Santiago-Rodriguez). Santiago-Rodriguez told the CI that he wanted to sell one kilogram of cocaine to the CI for $37,000.

At approximately 2:30 p.m., agents from the DEA's Philadelphia office and from the Philadelphia District Attorney's Office met with the CI at a prearranged location in Philadelphia. The CI and the CI's vehicle were then searched for contraband with negative results. Special Agent Koss equipped the CI with a transmitter/recorder device.

In a series of telephone calls on that day, Santiago-Rodriguez directed the CI to meet him at his residence, 922 West Rockland Street, in Philadelphia. During the course of these calls, Santiago-Rodriguez had told the CI that "his guy," (i.e., his supplier) was with him and was waiting for the CI to arrive.

At approximately 4:05 p.m., federal agents observed the CI arrive in the vicinity of 922 West Rockland Street in Philadelphia, and approach and then enter the rear passenger side of a tan Ford Explorer bearing Pennsylvania license plate number GYF-6486 that was parked in the vicinity of 922 West Rockland Street. Agents determined that the vehicle was registered to

---

[3]The Court sets forth the facts as testified to at trial.

Orlando Martinez, 642 West Clearfield Street, Philadelphia, Pennsylvania. The driver of the Ford Explorer was later identified as Chopin-Meza (also known as Orlando Martinez), the front passenger was later identified as Suastegui, and the back seat passenger was later identified as Santiago-Rodriguez.

When the CI approached Santiago-Rodriguez's residence, he was met by Santiago-Rodriguez and directed toward the Ford Explorer. Upon approaching the vehicle, the front seat passenger, Suastegui, rolled down his window and directed the men to get into the car. Once in the Ford Explorer, the CI saw Chopin-Meza retrieve a clear plastic bag containing cocaine from the center console of the vehicle, and hand the cocaine to the CI. Shortly thereafter, Suastegui showed the CI a napkin containing crack cocaine. Suastegui said that the cocaine had been cooked up into crack form. The CI got out of the car purportedly to get money for the cocaine.

At approximately 4:10 p.m., uniformed Philadelphia Police officers performed a traffic stop on the Ford Explorer in the vicinity of 700 Fisher Street. Upon approaching the vehicle, one officer observed Chopin-Meza make a throwing motion toward the rear of the vehicle. During the stop, Chopin-Meza failed to show his hand to the other officer as commanded. After all three defendants were removed from the vehicle by Philadelphia police, one of the officers recovered a handgun from the space between the front passenger seat and the center console.

At approximately 7:35 p.m., a search and seizure warrant for the Ford Explorer was signed by a state court judge. At approximately 7:40 p.m., federal agents recovered the following items from the Ford Explorer: (i) in excess of 600 grams of a substance later tested by a laboratory and determined to be cocaine, contained in a white plastic bag that itself was contained in a clear plastic bag (the white plastic bag was found in the rear pouch of the front

passenger seat); (ii) approximately 1.2 grams of a substance later tested by a laboratory and determined to be crack cocaine (the crack cocaine was found wrapped in a napkin which was recovered from the center console); and (iii) various documents recovered from the glove box and rear cargo area of the vehicle.

On January 28, 2009, when Chopin-Meza was arrested by Philadelphia Police, he identified himself as Orlando Martinez, and produced a Pennsylvania driver's license in that name. While in local custody, Chopin-Meza was interviewed by a federal Customs Agent. Chopin-Meza initially identified himself as Orlando Martinez and claimed to have been born in Puerto Rico. Ultimately, after the agent became suspicious, Chopin-Meza admitted his true identity, citizenship (Mexican) and the fact that he had previously been deported and had re-entered the United States without permission. Chopin-Meza signed a sworn statement attesting to these facts.[4]

On April 2, 2007, an individual who identified himself as Orlando Martinez submitted an application for a United States passport at the King of Prussia, Pennsylvania post office. That application was supported by a Puerto Rican birth certificate and a Pennsylvania driver's license and was sworn under penalty of perjury. That individual was in fact Chopin-Meza.

Santiago-Rodriguez and Suastegui were also interviewed by a federal Customs Agent while in local custody. Santiago-Rodriguez admitted that he was a citizen of the Dominican Republic and that he had entered the United States on foot in 2001 without legal papers. Suastegui admitted that he was a citizen of Mexico and that he had entered the United States in

---

[4]Defendant Chopin-Meza had been convicted of a California drug trafficking crime in 1994 and had been deported to Mexico in 1996.

2000 under a student visa. Suastegui also admitted, however, that he had been working and not attending school.

### III. DISCUSSION

Santiago-Rodriguez cites eight grounds for post-trial relief in support of his request that this Court "reconsider its sentence and modify the sentence imposed upon the defendant."[5] Suastegui raises five grounds of alleged error, which he cites as a basis for a new trial or "arrest[] of judgment."[6] The Court finds that each of the defendants' claims of error are without merit.

#### A. Defendant Suastegui's Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, a defendant may move for a judgment of acquittal within 14 days after a guilty verdict, and the Court may then set aside the jury's guilty verdict and enter an acquittal. Fed. R. Crim. P. 29(c). However, in reviewing such a motion, "a district court must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the evidence.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (citing *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)). As such, "a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (citing *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

---

[5]The Court assumes that the request for relief in Santiago-Rodriguez's motion was made in error, and that he intended to seek a new trial under Fed. R. Crim. P. 33, rather than to request reconsideration of a sentence that has not yet been imposed.

[6]The Court assumes that the request to arrest judgment in Defendant Suastegui's motion was made in error, and that he intended to seek a judgment of acquittal under Fed. R. Crim. P. 29.

Here, not only does Suastegui fail to argue that no reasonable trier of fact could have found him guilty at trial–he fails to argue anything at all. Suastegui offers not one case or argument to support his motion. He does not even contend that the Government failed to present legally sufficient evidence to prove him guilty of the crimes of which he was convicted.

Indeed, Suastegui would be hard-pressed to make such an argument. The record reflects that the CI testified that he met with all three defendants in a sports utility vehicle parked near 922 West Rockland Street in North Philadelphia. (2/22/10 Tr. 63:8-18, 64:21-66:21.) According to the CI, while in that car, all three defendants participated in an effort to sell what purported to be a kilogram of cocaine for $37,000. (*Id.* 66:23-74:17.) The transcript of the audio recording of this meeting corroborated the CI's testimony. (*Id.* 81:2-5.) Thus, there was more than sufficient evidence for the jury to determine that Suastegui had participated in a drug trafficking conspiracy with Santiago-Rodriguez and Chopin-Meza and had possessed the cocaine with intent to distribute.

Special Agent Koss testified that shortly after the CI left the vehicle, it was stopped. (2/23/10 Tr. 118:18-119:14.) Once Defendants were removed from the car, the police discovered a handgun stashed between the front passenger seat and center console. (*Id.* 119:15-21.) A subsequent search recovered a small quantity of crack cocaine within inches of the gun and about three-fourths of a kilogram of powdered cocaine from the pouch in the back of the passenger's seat. (2/24/10 Tr. 11:5-13:16). Based on this evidence, the jury could have readily concluded that the gun had been possessed in furtherance of the drug trafficking crimes.

**B.      Defendants' Motions for a New Trial**

Both Santiago-Rodriguez and Suastegui claim entitlement to new trials on a variety of independent and overlapping grounds, although they again fail to provide any support for these motions. Based on the record before the Court, however, the defendants have not demonstrated any Court error justifying such an outcome.

*1.      Santiago-Rodriguez's Pretrial Motions*

Santiago-Rodriguez argues that the Court erred in denying his repeated pretrial motions to compel discovery, for disclosure of other Rule 404(b) material, and to permit him to be arraigned before the jury. *See* Santiago Motion ¶¶ 4, 5, 9. In none of these instances does Santiago-Rodriguez explain how the Court erred in its original pretrial rulings, claim that the trial itself demonstrated the existence of an alleged error, or establish any prejudice. As such, the Court hereby denies these Motions as it did in advance of trial. *See* Court Order dated February 8, 2010 (Dkt. No. 89).

*2.      Santiago-Rodriguez's Batson Challenge*

Santiago-Rodriguez also argues that the Court erred in denying his *Batson* challenge during jury selection. *See* Santiago-Rodriguez Motion ¶ 7. Under *Batson*, a defendant must establish a *prima facie* case "by demonstrating a pattern of peremptory challenges of jurors of a particular race." *United States v. Milan*, 304 F.3d 273, 281 (3d Cir. 2002) (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)). If the defendant does establish such a pattern, the burden shifts to the government to "rebut the *prima facie* case by tendering a race-neutral explanation for the strikes." *Id.* If the government satisfies this burden, the defendant must establish intentional discrimination by demonstrating that the proffered explanation is pretextual. *Id.*

This Circuit has set forth five factors relating to the establishment of a *prima facie* case under *Batson*: (1) the composition of the venire panel; (2) the "nature of the crime;" (3) the "race of the defendant and the victim;" (4) a "pattern of strikes" against members of a racial group; and (5) any discriminatory statements or questions by the prosecutor during voir dire. *Deputy v. Taylor*, 19 F.3d 1485, 1492 (3d Cir. 1994) (citations omitted). This case raised no issues of violence, despite the presence of a firearm; all three defendants were Hispanic, as was the government's main witness; and counsel for the Government made no discriminatory statements or asked any discriminatory questions. Thus the second, third and fifth factors did not come into play.

As for the first and fourth factors, counsel for defendants argued that the Government's peremptory striking of three African-American jurors violated *Batson*. (2/18/10 Tr. (Voir Dire) 81:18-82:2.) Of the five jurors identified visually as "African-American,"[7] three were peremptorily struck by the Government, one was peremptorily struck by the defense and two were empaneled on the jury. (*Id.* 83:12-87:9.) Based on this record, the Court denied the *Batson* challenge during voir dire as failing to establish a *prima facie* violation, and the Court reiterates that finding here.

3.      *Santiago-Rodriguez's* <u>Pinkerton</u> *Instruction Challenge*

In closing arguments, all counsel referred to the Government's theory that all three defendants were responsible for possessing the handgun found at the time of their arrest, in

_____

[7]The "jury information sheets did not contain any identifier regarding race or any other *Batson* class." 2/18/10 Tr. (Voir Dire) 83:6-7.)

accordance with the requirements of *United States v. Pinkerton*, 328 U.S. 640, 647-48 (1946).[8]

The Court instructed the jury on *Pinkerton* liability using the Third Circuit model instruction;

subsequently the jury sent out a note asking for a copy of the Court's *Pinkerton* instruction. The

Court granted this request, which Santiago-Rodriguez now contends was error warranting a new

trial. *See* Santiago-Rodriguez Motion ¶ 8. However, the district court retains broad discretion in

responding to jury questions, including whether to provide the jury with a portion of the written

charge in response to the jury's inquiry. *See United States v. Henry*, 878 F.2d 937, 940 (6th Cir.

1989) ("As to the Court's decision to send in only the instructions relating to the substantive

counts, we find this to be a proper exercise of the court's discretion."), *impliedly overruled on*

*other grounds*, *United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001).[9]  Trial lasted for more

_____

[8]*Pinkerton* established that a criminal defendant is liable for the reasonably foreseeable actions of his co-conspirators. *See United States v. Ramos*, 147 F.3d 281, 286 (3d Cir. 1998) (applying *Pinkerton* liability in the context of 18 U.S.C. § 924(c)).

[9]The Third Circuit has not ruled directly on this issue, but nearly every other circuit to consider this question has held that the trial court may determine the propriety of submitting any or all of the jury instructions to the jury in written form. *See, e.g., United States v. Parent*, 954 F.2d 23, 24 (1st Cir. 1992) (trial judge may, but need not, give jury written copy of complete charge at outset of deliberations); *United States v. Young*, 140 F.3d 453, 456 (2d Cir. 1998) (where trial court is unwilling to meet jury's request for extensive readbacks of charge, court could provide jury with written transcript of the charge); *United States v. Hooper*, 575 F.2d 496, 499 (5th Cir. 1978) (furnishing jury with written copy of jury charges was not reversible error); *United States v. Blane*, 375 F.2d 249, 255 (6th Cir. 1967) (giving to jury written copy of entire charge was not improper in view of lengthy trial and extensive matters covered by instructions); *United States v. Standard Oil Co.*, 316 F.2d 884, 896 (7th Cir. 1963) (handing jury a copy of court's instructions was not abuse of discretion where reading of instructions to jury required more than an hour and litigation was complex); *United States v. Whitten*, 706 F.2d 1000, 1019 (9th Cir. 1983) (jury was permitted to refer to written copy of lengthy instructions on conspiracy during its deliberations), *impliedly overruled on other grounds*, *United States v. Perez*, 116 F.3d 840, 844-46 (9th Cir. 1997).

In fact, at least one federal appeals court has found that a district court abused its discretion in *failing* to make written instructions available to counsel or jury where the trial was lengthy and complicated, and a copy of a the indictment was given to the jury. *See United States*

11

than five days, and the Court required over an hour and a half to read the more than 50 instructions to the jury; providing a written copy of one such instruction was more than reasonable. Santiago-Rodriguez suggests no reason why, in this instance, providing the specific written charge to the jury would have in any way prejudiced his case such as to require a new trial. As such, his claim of error fails on this front.

4.    *Suastegui's Hearsay Challenge*

Under Rule 802 of the Federal Rules of Evidence, hearsay is inadmissible unless an exception applies. Hearsay itself remains defined as an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c).

In the course of trial, Suastegui sought to admit through cross-examination a number of hearsay statements contained in documents that he identified as Suastegui Exhibits 1, 2 and 3. For example, Suastegui attempted to introduce to the jury the substance of an affidavit drafted in support of a warrant to search the car in which the defendants had been arrested. (2/24/10 Tr. 50:6-20.) The affidavit was prepared by an officer who was not present at the scene of the events reported, but repeated information relayed to the officer. (*Id.* 145:16-147:3.) As such, the affidavit was not only an out-of-court statement itself, but contained the out-of-court statements of other persons, rendering it double hearsay. As Suastegui failed to identify any hearsay exceptions applicable to the material he sought to place before the jury, this Court sustained the Government's objections and prohibited Suastegui from introducing the statements. (*Id.* 58:1-13.)

Offering no authority to support his effort to place hearsay before the jury, Suastegui now

---

*v. Van Dyke*, 14 F.3d 415, 423 (8th Cir. 1994).

moves for a new trial on the ground that the Court's hearsay rulings were erroneous. *See* Suastegui Motion ¶ 6. The Court denies Suastegui's motion.[10]

5.      *Santiago-Rodriguez and Suastegui's Discovery Challenges*

Both Santiago-Rodriguez and Suastegui contend that the Government "engaged in prosecutorial misconduct by failing to turn over information and documentation concerning the [CI]," specifically any statements concerning previous discussions between the CI and these defendants concerning the sale by Santiago-Rodriguez of firearms. Santiago-Rodriguez Motion ¶ 6; Suastegui Motion ¶ 5.[11] However, the Government was not required to disclose any such information and thus the defendants are not entitled to a new trial based on the court's decision not to compel such discovery.

---

[10]As the Government notes in its Opposition, the Court granted Suastegui broad discretion to question Government witnesses about whether they had supplied the statements contained in the affidavit. Govt. Opp. at 15, n.5. However, this discretion did not render the underlying documents admissible. A witness may be impeached with a prior inconsistent statement made by that witness, but the impeachment evidence is not admissible as substantive evidence unless provided under oath subject to cross-examination. Fed. R. Evid. 613(a), 801(d)(1). Even if an affidavit prepared by a non-testifying declarant could be construed as the testifying witness's own statement, that statement remains inadmissible if the information it contains was not in fact supplied by the witness. *See Kesmarki v. Kisling*, 400 F.2d 97, 102 (6th Cir. 1968) (where litigant denied that she gave her attorney information upon which attorney relied to provide answers to interrogatories submitted to litigant in separate action, the answers were not admissible for impeachment purposes).

[11]Santiago-Rodriguez further claims that the Government committed misconduct by not turning over information about any discussions between him and the CI concerning "any crime, conspiracy, or gun." Santiago-Rodriguez Motion ¶ 6. The Government acknowledges that it is "aware that, on the same day that he met with the informant in an attempt to broker a gun sale, Santiago-Rodriguez also attempted to broker a cocaine sale with a seller, who was not any of the defendants in this case." Govt. Opp. at 15-16, n.6. This transaction was neither recorded nor consummated. For the same reasons discussed below concerning Santiago-Rodriguez's conversation about the sale of firearms, the Government was also not required to disclose this information.

Following cross-examination of the CI pursued by Suastegui, the Government informed the Court and counsel for the defendants that Santiago-Rodriguez had offered to sell firearms to the CI on an unrelated occasion. (2/22/10 Tr. 117:18-24.) The Government acknowledged that it was aware of the following with regard to Santiago-Rodriguez's prior offers to sell firearms to the CI:

1.     On or about November 17, 2008, the CI contacted Special Agent Koss and advised that he was familiar with an individual known to him as "Poppy."[12] The CI related that Poppy had offered to sell him a .45 caliber handgun that had been used one to two weeks before to commit a homicide. Poppy wanted about $300 for the gun.

2.     On or about November 19, 2008, the CI met with Poppy. The meeting was not recorded, but was observed by DEA agents. After receiving a cal, Poppy told the CI that he was waiting for the man with the gun to arrive. Shortly thereafter, a black male in his early 20s arrived at the location where Poppy and the CI were meeting. This man, who introduced as "S," told the CI that he no longer had the .45 caliber gun. He did, however, offer to sell an AK-47 to the CI.

3.     During the meeting on November 19, 2008, "S" provided a cell telephone number to the CI. That number turned out to be disconnected, and the CI was not able to contact "S." As a consequence, no gun transaction was ever completed.

Govt. Opp. at 16-17. This information led the Government to believe that Santiago-Rodriguez had offered to broker the sale of two firearms but neither sale was completed and that neither of the guns referred to by Santiago-Rodriguez was the gun recovered when the three defendants in this case were arrested.[13] *Id.* at 17. Furthermore, the Government believed that Santiago-Rodriguez "had possessed neither of these other guns himself, but that he was merely attempting to broker a transaction for a disclosed principal, 'S,' who was neither of the other defendants in

---

[12]Poppy was later identified as Santiago-Rodriguez.

[13]The gun in this case was a Witness 9 millimeter handgun, distinguishable from an AK-47 assault rifle and a .45 caliber handgun. *See* Govt. Opp. at 17.

this case." *Id.*

Under Federal Rule of Criminal Procedure 16, the Government must disclose information that falls into a number of categories. However, as Santiago-Rodriguez's statements to the CI were not made to a known government agent and were not written or recorded, they do not fall into any of those enumerated categories. *See* Fed. R. Crim. P. 16(a)(1).[14]

In addition to the Rule 16 categories, the Government is required to produce to the defense all exculpatory material. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (government must disclose evidence that is favorable to the accused and material either to guilty or

---

[14]Rule 16(a)(1)(A) provides that the government must disclose "any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Rule 16(a)(1)(B) further provides, in relevant part, that:

> Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying or photographing ... the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent.

Fed. R. Crim. P. 16(a)(1)(B)(ii).

Here, however, Santiago-Rodriguez did not make the statements at issue in response to questioning by a person he knew to be a government agent; he was unaware of the CI's true identity at the time these statements were made, and "S" was not a government agent. *See, e.g., United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir. 1985), *cert. denied*, 474 U.S. 994 (1985) (Rule 16(a)(1)(A) does not require disclosure of statements by others to government which recount defendant's statements); *United States v. McClure*, 734 F.2d 484, 493 (10th Cir. 1984) (defendant not entitled to substance of oral statement made to one who was not known by defendant to be a government agent); *United States v. Viserto*, 596 F.2d 531, 538 (2d Cir. 1979), *cert. denied*, 444 U.S. 841 (1979) (notes of unrecorded conversation overheard by government agent, whose presence was unknown to defendant, are not discoverable under Rule 16(a)(1)(A)); *United States v. Heldon*, 479 F. Supp. 316, 323 (E.D. Pa. 1979) (where statements to third parties were not made in response to interrogation by a person then known to defendants as a government agent, defendants were not entitled to copies of such statements).

punishment); *Giglio v. United States*, 405 U.S. 150, 154 (1972 (both impeachment evidence and exculpatory evidence fall within the *Brady* rule).  However, the *Brady* obligation required only that the Government provide *exculpatory* material–not *inculpatory* material, no matter how helpful the other defendants' counsel may find it.  *See United States v. Gonzales*, 90 F.3d 1363, 1369 (8th Cir. 1996) ("If the evidence is inculpatory, then *Brady* is not violated, regardless of the effect at trial of the nondisclosure.").  For the same reason, the Government was not required to supply the defense with evidence that could be characterized as simply neutral or irrelevant.  *See United States v. Agurs*, 427 U.S. 97, 109-10 and n.16 (1976) (no requirement to disclose preliminary, challenged or speculative information).

None of the Santiago-Rodriguez's prior conversations with the CI could be considered impeaching.  The CI proposed to engage in a criminal transaction Santiago-Rodriguez as a government agent under the DEA's control; thus his interactions with Santiago-Rodriguez in no way undermine his credibility.  Nor do they provide any exculpatory value to either defendant that would require their disclosure.  With regard to Santiago-Rodriguez, the fact that he previously offered to facilitate the sale of two weapons to the CI does not make it less likely that he committed the drug trafficking crimes to which he pleaded guilty or gun crimes that he contested at trial.[15]

As for Suastegui, the withheld statements did not relate to the gun recovered from the car in which he was arrested, and "S" was not any of the defendants in this case.  Consequently, evidence of Santiago-Rodriguez's earlier negotiations could not connect the recovered gun to any

---

[15]While these conversation may tend to show Santiago-Rodriguez's propensity for criminal conduct, such evidence would be inadmissible on those grounds.  *See* Fed. R. Evid. 404(b).

of the defendants in this case and thus could not exculpate Suastegui.  At trial, however,

Suastegui argued that Santiago-Rodriguez's prior firearms history makes it more likely that the

gun in the car belonged to Santiago-Rodriguez.  (2/22/10 Tr. 120:4-14.)  However, this theory

fails as well; propensity evidence remains inadmissible under Federal Rule of Evidence 404(b).

Not only did the Government have no obligation to disclose these statements, but the evidence

would have been barred by this Court had it tried to do so.  *See United States v. Williams*, 458

F.3d 312, 313 (3d Cir. 2006) (where defendant was charged with gun possession after being

arrested in location where different gun was also found, Rule 404(b) prohibited introduction of

evidence that another person present in that location had  prior history with guns, thereby

suggesting that the gun in question belonged to that person and not defendant).

Finally, even if propensity evidence were not barred, these conversations still do not

establish that Santiago-Rodriguez ever owned or possessed a gun.  They show merely that he

introduced the CI to a person who was ultimately successful in procuring an illegal firearm.  This

evidence does not make it any more likely that the gun found in the car in which these defendants

were arrested actually belonged to Santiago-Rodriguez.  Thus the conversations were not

exculpatory and the Government faced no obligation to disclose them to the defendants.

> 6.      *Santiago-Rodriguez and Suastegui's Motions to Sever*

Both Santiago-Rodriguez and Suastegui contend–again without any support–that the

Court erred in "denying the defendant[s'] Motion[s] for Severance."  Santiago-Rodriguez Motion

¶ 3; Suastegui Motion ¶ 4.  As an initial matter, Santiago-Rodriguez never filed a motion for

severance and thus waived any argument premised on that theory.  Fed. R. Crim. P. 12(b)(3)(D)

(motion to sever must be raised prior to trial); Fed. R. Crim. P. 12(e) (failure to file motion for

severance in advance of trial may constitute waiver); *United States v. Heilman*, Nos. 08-1056, 08-2112, 08-2195, 2010 WL 1583097, at *34 (3d Cir. Apr. 21, 2010) (same). Suastegui, however, did file a motion to sever in advance of trial, based on the his claim that the guilty pleas of Santiago-Rodriguez and Chopin-Meza to some but not all of the charges would prejudice Suastegui at trial. This Court denied that motion on the grounds that an instruction directing the jury to consider each defendant separately would rectify any possible prejudice. To the extent Suastegui here seeks merely to retread the argument he made unsuccessfully before trial, the Court once again denies it. *See United States v. Panepinto*, 430 F.2d 613, 615 (3d Cir. 1970) (defendant was not entitled to mistrial where several defendants entered guilty pleas before trial commenced; court adequately instructed jury on three occasions that they were to draw no unfavorable inferences from absence of any of co-defendants named in indictment).

However, perhaps Suastegui's post-trial Motion intends to argue that severance should have been granted so that his counsel could have cross-examined the CI about the CI's earlier conversations with Santiago-Rodriguez regarding the sale of weapons. *See* Govt. Opp. at 22.[16] Even if the Court were willing to entertain it, this new claim (not raised in Suastegui's pre-trial severance motion) would fail on the merits. As discussed above, the conversations between the CI and Santiago-Rodriguez concerning unrelated gun transactions were inadmissible as evidence at Suastegui's trial, excluded by Federal Rule of Evidence 404(b). *See supra*, Section III.B.4. Indeed, those conversations provided no exculpatory value to Suastegui with regard to any of the charges. As a result, even if severance had been granted, the Court would not have allowed

---

[16]As the Government points out, Santiago-Rodriguez would have no standing to move for severance on this ground, as he was not prejudiced by the cross-examination limitations placed by the Court on Suastegui. *See* Govt. Opp. at 22-23 n.13.

Suastegui to further cross-examine the CI about the prior gun transaction negotiations with Santiago-Rodriguez; those statements would have remained inadmissible hearsay not subject to any exceptions. *See id.*[17]

7. *Santiago-Rodriguez and Suastegui's Requests for Mistrial*

Finally, Santiago-Rodriguez and Suastegui claim that the Court should have granted a mistrial when the CI referred to the existence of his earlier gun-related conversations with Santiago-Rodriguez. *See* Santiago-Rodriguez Motion ¶ 2; Suastegui Motion ¶ 3. At the outset, the Court notes its confusion as to Suastegui's grounds for this contention; the CI's remark was in response to a question posed by Suastegui (2/22/10 Tr. 137: 4-138:13.) Furthermore, Suastegui elsewhere insisted that he was entitled to elicit the information contained in that remark. (*Id.* 119:14-18.) The Court cannot see how Suastegui was in any way prejudiced by the CI's remark; no basis for a new trial exists on this ground.

While Santiago-Rodriguez has standing to object to the CI's remark, the Court cannot find that he was prejudiced either. It is true that the CI was instructed not to discuss on the stand his prior conversations with Santiago-Rodriguez regarding other gun transactions. (*Id.* 119:19-25, 122:20-22, 126: 3-7.) However, under cross-examination Santiago-Rodriguez did make one discrete comment on the subject. (*Id.* 138:4-5.) He did not repeat the comment, nor did any party or counsel refer to it. Furthermore, Santiago-Rodriguez expressly declined the Court's offer of a curative instruction, presumably because he felt such an instruction would merely draw

---

[17]Separately, Suastegui argues that the Court erred in precluding him from cross-examining the CI about the CI's earlier conversations with Santiago-Rodriguez concerning the possible purchase of firearms. *See* Suastegui Motion ¶ 2. For the same reasons set forth above, this claim fails as well.

further attention to the CI's comment.

Given that he refused a curative instruction, Santiago-Rodriguez must demonstrate that the damage inflicted by the CI's lone comment regarding the prior firearms negotiations was so great that it was impossible to cure. But here Santiago-Rodriguez has not argued he suffered *any* prejudice from the remark. The only prejudice the Court can imagine to be claimed is, in the Government's words, that:

> the jury heard the [CI's] isolated answer about an unconsummated firearm transaction, concluded that Santiago-Rodriguez must be the kind of person who traffics in firearms, and therefore determined that the gun found in the front seat of Chopin-Meza's car must have belonged to Santiago-Rodriguez despite the fact that Santiago-Rodriguez was sitting in the back.

Govt. Opp. at 25. This chain of reasoning is simply too attenuated to attribute to the jury, and ultimately, the jury demonstrated that it did not fall victim to any such conclusions.

Under the *Pinkerton* theory, discussed above, in order to convict Santiago-Rodriguez of the first gun possession charge (possession of a firearm in furtherance of a drug trafficking crime), the government did not have to prove that Santiago-Rodriguez ever possessed the gun found in the car in which he was arrested. *See* 3rd Circuit Model Criminal Jury Instructions, No.7.03 (2009). However, in order to convict Santiago-Rodriguez of the second gun possession charge (illegal alien in possession of a firearm), the jury would have to have concluded that Santiago-Rodriguez either actually or constructively possessed the gun found in the car. *Cf. id.* The jury convicted Santiago-Rodriguez of the first gun charge, but not the second. In other words, the jury must have concluded the Santiago-Rodriguez did not actually or constructively possess the gun.[18] This verdict makes quite clear that the jury could not have been prejudiced by

---

[18]Santiago-Rodriguez's status as an illegal alien was undisputed.

the CI's comment with regard to the gun possession charges, and renders Santiago-Rodriguez's motion for a new trial entirely inappropriate.

**IV.    CONCLUSION**

For the reasons set forth above, Defendants Santiago-Rodriguez and Suastegui's Post-Trial Motions shall be denied.  An appropriate Order follows.